**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF PUERTO RICO**

LAURA LUGO,

     Plaintiff,

        v.                     CIV. NO. 09-1522 (PG)

AVON PRODUCTS, INC.,

     Defendant.

<u>**OPINION AND ORDER**</u>

Plaintiff Laura Lugo (hereinafter "Plaintiff" or "Lugo") filed this action pursuant to the Age Discrimination in Employment Act ("ADEA" or "the Act"), 29 U.S.C. § 623, against her former employer Avon Products, Inc. ("Avon" or "Defendant" or "the Company"), alleging discrimination on the basis of age and retaliation for engaging in protected conduct. <u>See</u> Docket No. 1. Specifically, Lugo claims that she was the victim of harassment and a hostile work environment and that she was transferred and eventually fired in violation of the Act. <u>See</u> <u>id.</u> Lugo also pleads supplemental state law claims for age discrimination under Puerto Rico's anti-discrimination statute, Law No. 100 of June 30, 1959 ("Law No. 100"); P.R. Laws Ann. tit. 29, § 146, *et seq.*, Puerto Rico's wrongful termination statute, Law No. 80 of May 30, 1976 ("Law No. 80"), P.R. Laws Ann. tit. 29, § 185, *et seq.;* and, Puerto Rico's general tort statute, Article 1802 of the Puerto Rico Civil Code ("Article 1802"), P.R. Laws Ann. tit. 31, § 5141.

Before the Court are Avon's Motion for Summary Judgment (Dockets No. 37-38), Plaintiff's Opposition thereto (Dockets No. 48, 50) and the Defendant's Reply (Docket No. 55-56). After a close examination of all the evidence on record and a careful review of the applicable statutory and case law, the Court **GRANTS IN PART AND DENIES IN PART** the Defendant's motion for summary judgment for the reasons explained below.

**I. SUMMARY JUDGMENT STANDARD**

A motion for summary judgment is governed by Rule 56(c) of the Federal Rules of Civil Procedure, which allows disposition of a case if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as

a matter of law." See Sands v. Ridefilm Corp., 212 F.3d 657, 660 (1st Cir.2000). A factual dispute is "genuine" if it could be resolved in favor of either party, and "material" if it potentially affects the outcome of the case. See Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 19 (1st Cir.2004).

To be successful in its attempt, the moving party must demonstrate the absence of a genuine issue as to any outcome-determinative fact in the record, see DeNovellis v. Shalala, 124 F.3d 298, 306 (1st Cir.1997), through definite and competent evidence. See Maldonado-Denis v. Castillo Rodriguez, 23 F.3d 576, 581 (1st Cir.1994). Once the movant has averred that there is an absence of evidence to support the non-moving party's case, the burden shifts to the non-movant to establish the existence of at least one fact in issue that is both genuine and material. See Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir.1990) (citations omitted). If the non-movant generates uncertainty as to the true state of any material fact, the movant's efforts should be deemed unavailing. See Suarez v. Pueblo Int'l, 229 F.3d 49, 53 (1st Cir.2000). Nonetheless, the mere existence of "some alleged factual dispute between the parties will not affect an otherwise properly supported motion for summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). However, "summary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." Medina-Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir.1990).

At the summary judgment juncture, the Court must examine the facts in the light most favorable to the non-movant, indulging that party with all possible inferences to be derived from the facts. See Rochester Ford Sales, Inc. v. Ford Motor Co., 287 F.3d 32, 38 (1st Cir.2002). The Court must review the record "taken as a whole," and "may not make credibility determinations or weigh the evidence." Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 135 (2000). This is so, because credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. Id.

## II. FACTUAL FINDINGS

Before setting forth the facts found by this Court to be undisputed and relevant to the matter at hand, we must first address several compliance issues presented to the Court when reviewing Defendant's and Plaintiff's statements of facts.

"Documents supporting or opposing summary judgment must be properly authenticated." Carmona v. Toledo, 215 F.3d 124, 131 (1st Cir.2000) (citing FED.R.CIV.P. Rule 56(e)). To be admissible at the summary judgment stage, documents must be authenticated by and attached to an affidavit that meets the requirements of Rule 56(e). See 10A WRIGHT, MILLER & KANE, FEDERAL PRACTICE & PROCEDURE § 2722 (3d ed.1998). "Under Federal Rule of Civil Procedure 56(e), on summary judgment, the parties in their supporting affidavits shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Hoffman v. Applicators Sales And Service, Inc., 439 F.3d 9, 14 (1st Cir.2006). "Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith." Id. "The failure to authenticate a document properly precludes its consideration on a motion for summary judgment." Robinson v. Bodoff, 355 F. Supp. 2d 578, 582 (D.Mass.2005) (striking all exhibits that were submitted without affidavits).

Moreover, a party must not "[overlook] the crucial point that documents do not automatically become a part of the record simply because they are the products of discovery." Hoffman, 439 F.3d at 15. "If a party wishes the court to consider matters disclosed during discovery, he must take appropriate steps to have them included in the record: merely citing to pages of discovery materials not of record does not suffice." Id.

Pursuant to the foregoing, some of the materials submitted by both the Plaintiff and the Defendant are inadmissible for the purposes of summary judgment. After a careful review of the record, this Court finds that many of the exhibits submitted by the parties in support of their statements of fact lack an authenticating affidavit or fail to indicate whether they stem from discovery materials on file. As a result, unless admitted by the opposing party, the Court did not consider the factual statements submitted by the parties that were not properly supported by the record on file.

As per the foregoing discussion, the Court found the following relevant facts were undisputed:

**Parties**:

1.    Avon is a company engaged in the sales and distribution of beauty and
      related products, including, amongst others, cosmetics, fragrances,
      toiletries, jewelry, accessories, apparel, gifts, decorative, home
      related and wellness products.

2.    Plaintiff Laura Lugo was born on July 8, 1956.

**Employment:**

3.    On January 27, 1992, Lugo began working for Avon.

4.    Lugo started working for Avon as a Promoter in the Mayagüez area.

5.    At all times relevant herein, Lugo occupied the position of District Sales Manager ("DSM").

6.    As part of her employment with Avon, and in addition to her salary, Lugo participated in Avon's group health insurance plan and its retirement plan, received a car allowance of $825 per month, had car insurance, and incentives on her sales performance in her Zone.

7.    Prior to September 13, 2007, and as relevant herein, Lugo was assigned to Zone 23, which corresponded to certain portions of the town of Mayagüez.

8.    As District Sales Manager, Lugo's duties included recruitment, maintenance of sales and orders, attending sales conferences, handling credits, collections, and meeting Zone objectives.

9.    At all relevant times herein, and since approximately 2004, Lugo was supervised by Roxana Vilella ("Vilella"), who occupied the position of Division Manager.

10.   Vilella was born on March 27, 1955.

11.   Vilella was in charge of preparing the sales plan for her Division with Avon's Sales Analyst and establishing Key Performance Indicators ("KPI's"), which were given to the District Sales Managers.

12.   Each District Sales Manager received a plan with specific KPI's to be achieved each year. The KPI's included goals in several areas, including, amongst others, recruitment of staff, orders, sales, returns or credits and collections and bad debt.

13.   At all relevant times herein, each District Sales Manager was responsible for achieving the Company's KPI's in their respective districts, or Zones.

14.   In terms of recruitment, Lugo was responsible for recruiting persons to sell Avon products through its catalogs.

15.   Avon sells its products through a process known as a "campaign". Each campaign is represented in a catalog, and is two weeks in length. During each campaign, Avon representatives promote the products in the corresponding catalog, and obtain orders of Avon products from said catalogs.

16.   In regard to orders, Avon establishes certain strategies and goals. Lugo

was responsible for verifying that orders would be deposited in each cycle, and of following up on those representatives who had not deposited any orders. Lugo was responsible for reaching the order goals for her assigned Zone during each campaign.

17.   In terms of sales, Lugo was responsible for obtaining the sales goals established by Avon for her Zone. In this regard, Lugo would create incentives for the sale of certain products, held sales conferences to motivate Avon representatives in her Zone and provide them with sales strategies, make follow-up calls to the representatives, and conducted visits to representatives.

18.   Lugo was also responsible for collecting damaged merchandise for credits, as well as unpaid balances.

19.   As part of her duties, Lugo participated in several meetings to develop the Leadership Program (also known as the multilevel program).

20.   Subsequent to the creation of the Leadership Program in 2007, all District Managers had to participate as part of their duties.

21.   The Leadership Program consisted of providing Avon Sales Representatives the opportunity to recruit other Sales Representatives, and was designed to result in the acceleration of sales for Avon.

22.   The Leadership Program is considered another business opportunity by means of which the Sales Representatives can earn higher commissions depending on the amount of additional Sales Representatives they recruit.

23.   Lugo's responsibilities in relation to the Leadership Program were to recruit, from the existing representatives, those who would, in turn, recruit others. Lugo would also train these representatives on the Program.

**Transfer:**

24.   There can be transfers of District Sales Managers amongst Zones based on Avon business needs.

25.   As of September 2007, a vacancy had arisen in Zone 10, inasmuch as its then District Manager, Carmen Soto, had requested a transfer to another Zone.

26.   Carmen Soto was approximately 55 years old at the time of the transfer and had been working for Avon for over 20 years.

27.   Zone 10 was comprised of the towns of Las Marías, Maricao, Moca, and Añasco.

28.   In 2006, under Carmen Soto's management, Zone 10 had achieved the Circle of Excellence award.

29.   On September 13, 2007, Vilella held a meeting with Lugo at a Ricomini Bakery in Hormigueros, Puerto Rico. During that meeting, Vilella informed Lugo that she would be transferred from Zone 23 to Zone 10.

30.   Vilella indicated to Lugo that she was being transferred to Zone 10 because Vilella needed someone with Lugo's experience and preparation in that Zone.

31.   At the time of the transfer, Vilella never told Lugo that the transfer was related to any performance problem. Vilella thought Lugo was an experienced manager and trusted her to have results in Zone 10.

32.   During the September 13, 2007 meeting, Vilella also informed Lugo that Maritza Tirado would be transferred into Zone 23. On that same date, Vilella also met with Maritza Tirado at Ricomini Bakery to inform her of her transfer to Zone 23.

33.   Neither Lugo's salary, nor her Company-sponsored benefits, were reduced as a result of her transfer to Zone 10. In addition, while in Zone 10, Lugo made commissions, which were based on sales.

34.   Avon did not perform a written performance appraisal of Lugo's performance before the transfer and Vilella has no single document that could help her identify the time when Avon decided to transfer Lugo from Zone 23 to Zone 10.

35.   Vilella cannot identify the circumstances that made her think for the first time the possibility of transferring Lugo from Zone 23 to Zone 10.

36.   At the time of the transfer, Vilella knew of Lugo's unavailability to go into the town of Maricao because her ex-husband, which had abused her, lived in Maricao. Vilella testified at her deposition that she told Lugo "let's work with that" with respect to her unavailability to go into Maricao. However, Vilella never talked about Lugo's unwillingness to go to Maricao with Lugo after their meeting at the Ricomini Bakery on September of 2007.

37.   Vilella trusted Lugo even though she reacted in such an emotional way to the decision to transfer her from Zone 23 to Zone 10. Vilella also believed that Lugo's reaction was sincere and that she was a professional employee.

38.   Lugo objected to the decision to transfer her from Zone 23 to Zone 10.

39.  As a result of the transfer, Lugo retained counsel who, on September 21, 2007, communicated in writing with Edgardo Ruiz ("Ruiz").

40.  Ruiz, who at all relevant times has occupied the position of Director of Human Resources for Avon, was born on April 17, 1950.

41.  The communication made no mention of any alleged ageist comments made by any Avon personnel, but was limited to the objection to the transfer, and indicated that it was discriminatory, inasmuch as Zone 23 would be occupied by a younger Avon employee.

42.  The September 21, 2007 communication from attorney Wanda Aragonés was the only complaint filed by Lugo during her employment at Avon in connection with her transfer to Zone 10.

43.  On September 28, 2007, Avon, through counsel, responded to the communication from Lugo's counsel, explaining its position as to her transfer to Zone 10.

44.  Dennis Roman ("Roman") occupied the position of Executive Sales Director and was Lugo's dotted line supervisor.

45.  Roman was born on January 15, 1960.

46.  Roman occupied the position of Regional Sales Executive Director from the middle of the year 2006 to the end of the year 2008.

47.  After receiving Lugo's letter, Roman explained to Human Resources that the decision to transfer Lugo from Zone 23 to Zone 10 was because they had made a performance appraisal of Lugo's execution and that the same was under expectations; that they had been monitoring Lugo's performance in Zone 23, and it seemed that the best outcome was the transfer to Zone 10 in order to see if her performance improved. These were the reasons given to Avon's lawyers to answer the letter.

48.  As of September of 2007, Zone 23 did not meet the minimum KPI's or goals set forth by Avon.

49.  During September of 2007, other District Sales Managers were transferred amongst different Zones.

**Anti-Discriminatory Policy:**

50.  During her employment with Avon, Lugo received Avon's Code of Business Conduct and Ethics, as well as Avon's Human Resources Manual of Policies.

51.  Both the Code and the Manual contain an anti-discrimination policy, as well as a procedure for employees to bring forth any claims of discrimination, including discrimination on account of age.

52.   The policy states that Avon does not tolerate improper conduct from managers or associates and that it will not tolerate discrimination in any type of form. The policy also states that Avon will not tolerate any type of retaliation against an employee that in good faith alleges being the victim of discrimination.

53.   The policy also establishes the procedure that an employee has to follow in order to bring a claim of discrimination. The first step in the process is for the employee that believes she has been the victim of discrimination to immediately report the same to Human Resources.

54.   The policy requires for Human Resources to promptly investigate and resolve the complaint. This must include: (1) meeting with the employee that reported the acts of discrimination and document her complaints assuring the employee that the investigation to be conducted will be confidential; (2) notify the employee that is charged with the discriminatory conduct about the claim in order to give said employee an opportunity to be heard; (3) inform both parties to the claim the resolution of the complaint assuring that corrective measures will be taken by the company; (4) maintain a confidential file with a summary of the allegations and the final determination of the company.

55.   Avon did not meet with Lugo in order to discuss her complaint in the letter and/or to know the facts pertaining to her complaint.

56.   Avon accepts it would have met with Lugo and discussed her allegations if the communication would have been directly from her to the company and not through an attorney.

**Termination:**

57.   A decision was made by Vilella, Roman, and Ruiz to terminate Lugo's employment.

58.   Jose Quiñones ("Quiñones"), who at all relevant times herein occupied the position of General Manager of Avon, is older than Lugo. Quiñones was the direct supervisor of Roman and Ruiz.

59.   Quiñones approved the decision to terminate Lugo's employment with Avon.

60.   Ruiz testified that in order to terminate Lugo from her employment, Avon took into consideration Lugo's capacity to adapt to change, her trustworthiness and commitment to the company.

61.   There were various meetings held by Avon's management team to discuss Lugo's employment termination. According to Ruiz, during the meetings, her attitude in accepting change was discussed. These included her

refusal to accept the transfer and accepting or not accepting to visit all the towns that were part of her management responsibility. Avon could not departmentalize Lugo's performance problems from her attitude toward change in the workplace because for the company her attitude towards change had affected her performance.

62. However, Vilella testified in her deposition that Lugo's refusal to go to Maricao was not discussed or considered as one of the reasons for terminating Lugo's employment.

63. On October 31, 2008, Lugo was terminated from her employment with Avon, during a meeting with Vilella and Ruiz.

64. Four (4) days before Lugo's termination, Avon sent Ms. Melendez to Zone 10 in order to support Lugo, share ideas and help her on how to address the changes to the new zone. Avon designated Ms. Melendez to help Lugo until December 2008 because by October 27, 2008, Avon still believed that Lugo could continue to improve her performance if some counseling, sharing of ideas and help was given to her.

65. In September of 2008, Lugo received a letter awarding her a monetary incentive of $500 dollars for successfully recruiting new representatives for Avon.

**Probationary Period Policy:**

66. Since December of 2006, Avon has in effect a Probationary Period Policy. The Probationary Period Policy is to provide Avon associates which have achieved a four (4) or less in his/her the evaluation or Performance Management Process (hereinafter referred to as "PMP") the opportunity to improve in his/her performance and obtain a superior result in a period of three (3) months. This is done because Avon recognizes that the probationary period can give an opportunity to an associate in the improvement of his/her performance and give the associate the opportunity to identify the specific areas for improvement that will be work upon during the period.

67. The probationary period in the policy is defined as the period of time in which the associate must demonstrate significant improvement in performance. This period in Avon is specifically identified as the period between January and March of each year.

68. Under Avon's probationary period policy the supervisor of an employee that is under a probationary period has the responsibility to (1) discuss the PMP with the employee; (2) inform the associate of the

result of the PMP; (3) inform the associate the areas of opportunity; (4) inform the associate that beginning in January until March, he/she will be in a probationary period; (5) inform the associate what is expected from him/her during the probationary period; (6) provide the associate with the help needed to achieve the improvement in his/her performance; (7) have periodic meetings with the associate to ascertain the progress; (8) prepare an evaluation corresponding to the probationary period and discuss the same with the associate during the first week of April; (9) make the appropriate recommendations pertaining to the results of the evaluation.

69. Under Avon's probationary period policy, the Company has the obligation to ascertain that: (1) the supervisor met with the associate privately in order to discuss the PMP; (2) the supervisor clearly explained the associate about the probationary period; (3) the supervisor provided the help needed to the associate; (4) the supervisor conducted the evaluation corresponding to the probationary period during the first week of April.

70. Under Avon's probationary period policy, the associate that improves his/her performance and that the evaluation at the end of the probationary period reflects such improvement will continue working for Avon after April 30th of that year and will be evaluated again at the end of the year in the formal PMP process.

71. Under Avon's probationary period policy the associate that fails to improve during the probationary period his/her employment will be terminated on or before April 30 of that year or the probationary period could be extended for a maximum of an additional three (3) months period up until June 30 of that year.

72. An extension of the probationary period could only be granted by the recommendation of the Department Director to the Human Resources Department and/or General Manager.

73. Lugo continued to work for Avon after the three (3) months provided in the policy and was not terminated until October 31, 2008, six (6) months after the end of the probationary period.

74. Apart from Lugo, on the years 2007 and 2008 the following DSM's were given a rating of five (5), the lowest performance rate: (1) Helga Medina; (2) Awilda Fontanez; (3) Helen Rosello; (4) Nancy Gonzalez; and (5) Edna Aponte.

75.   All of the DSM's mentioned above continued to work at Avon by June 2010. Lugo does not.

76.   Roman testified that from the above-named DSM's, Rosello and Gonzalez, after being rated a five (5) in their evaluation and being put in a probationary period, continued to performed inconsistently and did not comply with the numbers. Nevertheless, they continue working with the company.

77.   In addition, Rosello was granted a zone transfer from a zone comprising Fajardo, Culebras and Vieques (a tougher zone because of the transportation problems) to the Canovanas Zone (closer to the metropolitan area), and Gonzalez was granted a transfer to another position in Avon's Credit Department.

78.   On November 28, 2008, Lugo filed a Charge of Discrimination before the Equal Employment Opportunity Commission ("EEOC"), alleging age discrimination.

### III. DISCUSSION

**A. Age Discrimination in Employment Act**

**1. Claim of Illegal Transfer is Time-Barred**

In its motion for summary judgment, the Defendant requests that Plaintiff's claim regarding her transfer from Zone 23 to Zone 10 be dismissed because it is time-barred inasmuch as it took place on September 13, 2007, well outside the three-hundred day limitations period allowed for filing a charge with the EEOC under ADEA. The Court agrees.

In National Railroad Passenger Corp. v. Morgan, 536 U.S. 101 (2002), the Supreme Court of the United States held that a plaintiff seeking to recover for a discrete act of discrimination, as opposed to a pattern of harassing conduct that taken as a whole constitutes a hostile work environment, must file a charge within the 180- or 300-day time period after the discrete discriminatory act occurred in accordance with 42 U.S.C. § 2000e-5(e)(1). The United States Supreme Court further held that discrete acts such as "termination, failure to promote, denial of transfer, or refusal to hire" are considered separate incidents of discrimination not part of a series of violations. Morgan, 536 U.S. at 114. See also Rojas v. Principi, 326 F.Supp.2d 267, 275-276 (D.P.R 2004) (defining discrete act as any event "which constitutes specific employment occurrences with the potential for concrete adverse consequences on the plaintiff's employment status"). Other examples of "discrete acts" include: failure to renew contract, failure to hire for new

position, suspensions from employment, deprivation of duties, failure to select plaintiff for unannounced employment positions, written counseling, and proposed admonishments and reprimands. See Ruiz-Sulsona v. U.P.R., 334 F.3d 157, 160 (1st Cir.2003); Rivera-Torres v. Ortiz-Velez, 306 F.Supp.2d 76, 84 (D.P.R. 2002); Principi, 326 F.Supp.2d at 275. As such, said actions constitute a separate actionable "unlawful employment practice." Morgan, 536 U.S. at 114. Thus, "each discrete discriminatory act starts a new clock for filing charges alleging that act." Id. at 102. See also Rivera v. P.R.A.S.A., 331 F.3d 183, 188-89 (1st Cir.2003); Figueroa-Garay v. Municipality of Rio Grande, 364 F.Supp.2d 117, 125 (D.P.R. 2005). Therefore, "[d]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges." Arroyo-Audifred v. Verizon Wireless, Inc., 431 F.Supp.2d 215, 219 (D.P.R. 2006).

        The record shows that on September 13, 2007, Defendant assigned Lugo to cover a different territory, and action which the Plaintiff considered to be a demotion. It is uncontested that it wasn't until November 28, 2008 that she filed an administrative claim of discrimination with the EEOC. The transfer from Zone 23 to Zone 10 is in effect a discrete act of alleged discrimination, but because her claim was filed well outside the 300-day limitations period, it is not actionable pursuant to Morgan. See Fontanez-Nunez v. Janssen Ortho LLC, 447 F.3d 50, 55 (1st Cir.2006) (holding all discrete actions of alleged harassment or discriminatory conduct in violation of ADEA occurring over 300 days before plaintiff's administrative charge was filed were time-barred).

        Pursuant to the foregoing, Lugo's claims of discrimination as it pertains to her transfer to a different zone is time-barred and should be thus **DISMISSED WITH PREJUDICE**. Nevertheless, Plaintiff may use "the prior [time-barred] acts as background evidence in support of [any] timely claim." Vesprini v. Shaw Contract Flooring Services, Inc., 315 F.3d 37, 42 n. 4 (1st Cir.2002) (citing Morgan, 536 U.S. at 113).

        **2. Termination Claim**

        The ADEA makes it unlawful for an employer to "fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." Velez v. Thermo King de Puerto Rico, Inc., 585 F.3d 441, 446 (1st Cir.2009) (quoting 29 U.S.C. § 623(a)(1)). The Supreme Court recently clarified that, regardless of whether direct or circumstantial evidence is used to support an ADEA claim, and of whether a

burden-shifting analysis is employed by the court, plaintiffs must "establish that age was the 'but-for' cause of the employer's adverse action." Gross v. FBL Fin. Servs., Inc., 129 S.Ct. 2343, 2351 (2009). The Court declared in Gross that this "but-for" standard is a much higher standard than that which has been applied in Title VII cases. Id. Notwithstanding, there is no "heightened evidentiary requirement" for plaintiffs to satisfy their burden of persuasion through "direct evidence" as opposed to "circumstantial evidence." Id. at 2351 n. 4. The rule is simply that "[a] plaintiff must prove by a preponderance of the evidence (which may be direct or circumstantial), that age was the 'but-for' cause of the challenged employer decision." Id. (citing Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 141-143, 147 (2000)). See, e.g., Baker v. Silver Oak Senior Living Management Co., 581 F.3d 684, 688 (8th Cir.2009) (post-Gross Court of Appeals case utilizing direct evidence to preclude entry of summary judgment); see also Geiger v. Tower Automotive, 579 F.3d 614, 620-21 (6th Cir.2009) (post-Gross Court of Appeals case explaining direct evidence analysis at length).

In the absence of direct or "smoking gun" evidence, ADEA plaintiffs may nonetheless prove their cases by using the three-stage burden-shifting framework set forth by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See Melendez v. Autogermana, Inc., 622 F.3d 46, 50 (1st Cir.2010). The first stage of the McDonnell Douglas framework requires a plaintiff to establish a prima facie case of employment discrimination, which requires a showing that the plaintiff-employee: (1) was at least forty (40) years old at the time of the adverse employment action complained of; (2) his/her job performance met or exceeded the employer's legitimate expectations; (3) that his/her employer actually or constructively discharged him/her [or subjected him or her to other adverse employment actions]; and (4) that his/her employer had a continuing need for the services he/she had been performing. See Torrech-Hernandez v. General Elec. Co., 519 F.3d 41, 48 (1st Cir.2008). "This prima facie showing is not especially burdensome, and once established, gives rise to a rebuttable presumption that the employer engaged in intentional age-based discrimination." Autogermana, 622 F.3d at 50 (citing Woodman v. Haemonetics Corp., 51 F.3d 1087, 1091 (1st Cir.1995)).

As the First Circuit set forth in Thermo King, and more recently in Autogermana, once the plaintiff establishes a prima facie showing of age-based discrimination, the Court proceeds as follows:

> The burden of production then shifts to the employer to articulate a legitimate, non-discriminatory reason for its decisions. If the employer articulates such a reason, the McDonnell Douglas framework - with its presumptions and burdens - is no longer relevant. At this stage, the sole remaining issue is discrimination *vel non*. A plaintiff must be afforded the opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination. Ultimately, the plaintiff's burden is to prove that age was the but-for cause of the employer's adverse action.

Thermo King, 585 F.3d at 447-48 (internal quotation marks and citations omitted).

For purposes of the dispositive motion before the Court, "[t]he ultimate question on summary judgment in [an] ADEA case is whether or not the plaintiff has adduced **minimally sufficient** evidence to permit a reasonable factfinder to conclude that he was fired because of his age." Id. at 452 (internal quotation marks and citations omitted) (emphasis ours). "Evidence establishing a prima facie case, in combination with evidence of pretext, can be sufficient to defeat summary judgment if a rational factfinder could conclude that unlawful age discrimination was the actual, but-for cause of the discrimination." Id. (citations omitted).

In its motion for summary judgment, Avon first contends that Lugo is unable to establish the second prong of a prima facie case of discrimination inasmuch as her job performance was not meeting Avon's legitimate expectations at the time of her transfer and termination.[1] Alternatively, Avon contends that even if this Court were to conclude that Lugo established a prima facie case of discrimination under the ADEA, Avon need only articulate some legitimate, nondiscriminatory reason for its employment action. Accordingly, the Company reiterates that it terminated Lugo because she failed to meet Avon's legitimate job expectations as Sales District Manager. See Docket No. 38. According to Avon, Lugo did not meet the KPI's set forth in Zone 10. In addition, Roman felt that Lugo seemed to be resistant to the implementation of the Company's Leadership Program, that she had a pre-conceived notion that this type of program did not work, and that she was not complying with the Company's directives regarding the Leadership Program process. The reasons

---

[1] The Defendant only contends the second prong of the prima facie test inasmuch as Plaintiff was over 50 years old at the time of the alleged events, she was terminated and there was a continuing need for the services she had been rendering until her termination.

supporting Lugo's termination are evinced by Roman and Ruiz's affidavits. See Exhibits 10-11, Docket No. 37.

On the other hand, Lugo responds that at the time of the transfer, she was not told that it was due to any performance problem; that the Company never investigated her discrimination complaint pursuant to the procedures set forth in Avon's discrimination policy; that she approved the probationary period Avon placed her in after her transfer; that Avon failed to document her performance while in Zone 10 as required by Company policy; that in September of 2008, a month before her termination, Lugo received a letter awarding her a monetary incentive of $500 dollars for successfully recruiting new representatives for Avon; that during 2008, Lugo was never advised that she was not meeting Avon's expectations; that she was the victim of ageist comments on the part of Roman and Quiñones; and, that at least five (5) other DSM's with serious performance problems and who did not improve their performance have continued working for the Company. Accordingly, she claims that Avon's proffered reasons for terminating her are a pretext for discrimination. See Docket No. 48.

Despite the different stages of production and analysis described above, the First Circuit Court of Appeals has held that, on summary judgment, "the need to order the presentation of proof is largely obviated, and a court may often dispense with strict attention to the burden-shifting framework, focusing instead on whether the evidence as a whole is sufficient to make out a jury question as to pretext and discriminatory animus." Gomez-Gonzalez v. Rural Opportunities, Inc., 626 F.3d 654, 662 (1st Cir.2010) (citing Fennell v. First Step Designs, Ltd., 83 F.3d 526, 535 (1st Cir.1996). "Pretext can be shown by such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." Rural Opportunities, 626 F.3d at 662-663 (citing Morgan v. Hilti, Inc., 108 F.3d 1319, 1323 (10th Cir.1997)). Based on the evidence set forth by the parties at this point in the proceedings, the Court finds that Plaintiff has done just that.

It is an uncontested fact, based on Plaintiff's own admission, that her assigned Zone was not meeting the minimum goals set out by the Company at the time of her transfer in September of 2007. However, this fact is only material as to her illegal transfer claim, which has already been dismissed. As set

forth by the Defendant, Plaintiff was given a "fresh start" in a different zone and henceforth placed in a probationary period. See Vilella's Deposition of February 17, 2010 at page 95; Docket No. 38 at page 9. Accordingly, we will consider the evidence relating to Lugo's job performance from that point on.

The first relevant fact after Lugo's transfer is the fact that Avon placed her in a probationary period. Pursuant to Avon's Probationary Period Policy, an employee in a probationary period has the opportunity to improve his/her performance and obtain a superior result in a period of three (3) months. This three-month period in Avon is specifically identified as the period between January and March of any given year. The associate that improves his/her performance will continue working for Avon after April 30th of that year and will be evaluated again at the end of the year in the formal PMP process. Otherwise, the employment will be terminated for such employees who do not show improvement. In the alternative, the probationary period could be extended for a maximum of an additional three (3) months period up until June 30th of that year.

It is undisputed that Lugo, after being placed in a probationary period following her transfer in September of 2007, continued to work for Avon until October 31, 2008, six (6) months after what should have been the end of her probationary period. In addition, the Court notes that under the same policy, the supervisor of an employee that is under a probationary period has several responsibilities, including discussing his/her performance with the employee in question, preparing an evaluation corresponding to the probationary period and discussing the same with the employee. However, Avon failed to provide evidence of their own compliance with these aspects of their own policy, as pointed out by the Plaintiff in her response. In fact, the Court finds there is a complete lack of evidence in the record documenting any negative results, evaluations or warnings after Lugo's transfer, especially considering such structured evaluation processes and performance measurement mechanisms existed at Avon, according to the facts of this case. In addition, it is also uncontested that while five other DSM's were also placed in a probationary period for receiving the lowest possible rating in their respective evaluations between 2007 and 2008, all of them continued to work at Avon by June 2010 despite continuing to perform inconsistently and not complying with the Company's numbers. The Court is of the opinion that a reasonably jury could find these deviations from the Company's policies and practices, or disparate application thereof, as evidence of pretext. See Kouvchinov v.

Parametric Technology Corp., 537 F.3d 62, 68-69 (1st Cir.2008) (stating that pretext can be demonstrated through a showing that an employer has deviated inexplicably from one of its standard business practices).

The Plaintiff has also cast doubt as to the Company's proffered reasons for her termination. While Ruiz affirms that Plaintiff's refusal to visit all the towns that were part of her management responsibility was considered during the meetings held by Avon's management team to discuss Lugo's employment termination, Vilella testified in her deposition that Plaintiff's refusal to go to Maricao was not discussed or considered as one of the reasons for terminating Lugo's employment. As to the Company's other proffered reason for Lugo's termination, namely, that she seemed resistant to the implementation of the Leadership Program, which consisted of providing Avon Sales Representatives the opportunity to recruit other Sales Representatives and thus accelerate sales, Plaintiff notes that she earned a monetary incentive for recruiting new sales people just one month before her termination. These inconsistencies, the Court finds, certainly diminish the credibility of Avon's articulated reasons to terminate Lugo.

Finally, there is the matter of the ageist comments Plaintiff alleges Roman and Quiñones made during conversations, in conference rooms, or when the DSM's were in training or in meetings, to the effect that old people needed their "hard disk changed" because they were reluctant to sudden changes and that old ladies were obsolete. In addition, Lugo avers that Román told her that: "It's just that you don't learn. Since you are old, you want to stay in the same thing." See Docket No. 50. Although the weight of such remarks is circumscribed if they were made in a situation temporally remote from the date of the employment decision or if they were not related to the employment decision in question or were made by nondecisionmakers, see McMillan v. Massachusetts Soc'y for the Prevention of Cruelty to Animals, 140 F.3d 288, 301 (1st Cir.1998), evidence of age-related comments could support an inference of pretext and discriminatory animus, particularly if the comments were made by the key decisionmaker, see Dominguez-Cruz v. Suttle Caribe, Inc., 202 F.3d 424, 433 (1st Cir.2000). See also Straughn v. Delta Air Lines, Inc., 250 F.3d 23, 35-36 (1st Cir.2001) (holding that in combination with other evidence, so-called "stray remarks" may permit a jury in an employment discrimination action reasonably to determine that an employer was motivated by a discriminatory intent). Despite the fact that these comments are insufficient to ground a claim of hostile work environment under ADEA - as

shall be discussed in the following section of this order -, the Court finds they are material to the question of pretext in conjunction with all the other weaknesses and inconsistencies in the Defendant's case that the Plaintiff has pointed out.

The Court is mindful that its role is not to "second-guess the business decisions of an employer, nor to impose [its] subjective judgments of which person would best fulfill the responsibilities of a certain job." Petitti v. New England Tel. & Tel. Co., 909 F.2d 28, 31 (1st Cir.1990). "Courts may not sit as super personnel departments, assessing the merits - or even the rationality - of employers' nondiscriminatory business decisions." Mesnick v. Gen. Elec. Co., 950 F.2d 816, 823 (1st Cir.1991). However, considering the only admissible evidence in support of Lugo's inability to meet Avon's job expectations is Roman's and Ruiz's attached affidavits, which are vehemently denied by the Plaintiff, the Court has no other choice but to deny Avon's motion for summary judgment regarding Plaintiff's ADEA claim as to her termination. To the extent Avon's proffered reasons for terminating Plaintiff from her employment are based on her supervisors' impressions (as opposed to documented deficiencies in her work performance), they are a matter of credibility that may not be determined by the undersigned. To decide whether summary judgment is warranted would require that the Court weigh the evidence and decide who is more credible, Plaintiff or Defendant. This the Court cannot do as credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are issues that must be decided by the jury. Plaintiff's evidence "establishes factual disagreements as to which reasonable minds may differ. No more is exigible … Right or wrong, the plaintiff is entitled to present her case to a jury." See Cortes-Irizarry, 111 F.3d at 189 (1st Cir.1997)(internal quotations omitted).

Quite simply, the controversies as to the facts mentioned above preclude the entry of summary judgment in Defendant's favor. Therefore, having carefully reviewed the record before the Court, we find that the Plaintiff has successfully rebutted Defendant's articulated reason for terminating her. The Defendant's motion for summary judgment is thus **DENIED** as to Lugo's ADEA illegal termination claim under ADEA.

### 3. Hostile Work Environment Claim

The Defendant also argues for the dismissal of Plaintiff's hostile work environment claim by raising the Ellerth/Faragher affirmative defense: that because Avon exercised reasonable care to prevent, investigate and correct any

alleged discriminating behavior and the Plaintiff failed to use the corrective mechanism provided by the Company, Plaintiff's claim fails.

"An employer is subject to vicarious liability for an actionable hostile environment created by a supervisor with immediate or successively higher authority over an employee." Perez Cordero v. Wal-Mart PR, Inc., 646 F.Supp.2d 214, 221-222 (D.P.R. 2009) (internal citations and quotation marks omitted). "But the U.S. Supreme Court has established an affirmative defense that can relieve an employer from vicarious liability for a supervisor's alleged discriminatory harassment in cases where the alleged victim of harassment has not suffered a tangible job consequence." Id. at 222 (citing Faragher v. City of Boca Raton, 524 U.S. 775 (1998); Burlington Indus., Inc. v. Ellerth, 524 U.S. 742 (1998)).

In order to put forth a successful Ellerth/Faragher affirmative defense, an employer must prove that "it exercised reasonable care to prevent and correct promptly any … harassing behavior." Ellerth, 524 U.S. at 765. This can be shown with evidence that an employer promulgated an anti-harassment policy that included an internal grievance complaint procedure. Id. Second, the employer must also show that the "plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." Id.

In the case at hand, Lugo complains of ageist comments made to her by some of her supervisors, namely, Mr. Roman and Mr. Quiñones. As asserted by Avon, it is uncontested that at the time of the alleged discriminatory comments, Avon had an anti-harassment/discrimination policy with a complaint procedure available to employees and that Lugo never made use of this internal grievance procedure to complain of Roman's alleged comments. However, the Ellerth-Faragher defense is unavailable to Avon because Lugo was allegedly the victim of tangible employment actions by Roman himself, namely, her transfer and her termination. "A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Ellerth, 524 U.S. at 760. Because such actions have been alleged to have taken place here, the affirmative defense cannot apply in this case. See Franco v. Glaxosmithkline, No. 06-1781, 2009 WL 702221 (D.P.R. March 11, 2009) (holding Faragher/Ellerth defense was not available to defendant when supervisor's harassment culminated in a tangible employment action such as a warning and a termination).

Notwithstanding, the Defendant additionally argues that even assuming that the comments were made, they could only be identified as stray remarks and are thus insufficient to establish a hostile work environment claim. The Court agrees.

A hostile work environment claim is considered an adverse employment action but is analyzed under a different rubric. The First Circuit, recognizing hostile work environment claims under the ADEA, see Collazo v. Nicholson, 535 F.3d 41, 44 (1st Cir.2008), has held that a plaintiff must show that: (1) he/she is a member of a protected class; (2) he/she was subjected to unwelcome harassment; (3) the harassment was based on age; (4) the harassment was sufficiently pervasive or severe so as to alter the conditions of Plaintiff's employment and create an abusive work environment; (5) the objectionable conduct was both objectively and subjectively offensive such that a reasonable person would find it hostile or abusive and that the plaintiff did in fact perceive it to be so; and (6) some basis for employer liability has been established. See O'Rourke v. City of Providence, 235 F.3d 713, 728 (1st Cir.2001).

The Supreme Court in Harris v. Forklift Systems, Inc., 510 U.S. 17, 114 (1993), noted that the test for proving a hostile work environment "is not, and by its nature cannot be ... mathematically precise." Harris, 510 U.S. at 22. A court, determining whether an environment is sufficiently hostile or abusive, must examine the totality of the circumstances including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Id. at 23. Simple teasing, offhand comments, and isolated incidents (unless extremely serious) do not create a hostile work environment. See Faragher, 524 U.S. at 788. The Court's function is one of screening to determine whether, on particular facts, a reasonable jury could reach such a conclusion. See Noviello v. City of Boston, 398 F.3d 76, 94 (1st Cir.2005).

It is Lugo's contention that she felt discriminated against based on the conduct of her supervisors, Roman and Quiñones, who she alleges made ageist comments to the effect that old people needed their "hard disk changed" because they were reluctant to sudden changes. She also alleges they used the term "old sales," "the old ladies" and "the old sales ladies" to refer to the oldest managers during many meetings. She additionally claims that during said meetings, Quiñones and Roman also commented that old ladies were obsolete.

Finally, according to Lugo, Roman specifically told her that: "It's just that you don't learn. Since you are old, you want to stay in the same thing." See Docket No. 50 at ¶ 14-19.

Even assuming that Plaintiff's allegations are true, the Court is unable to find that Lugo's workplace at Avon was permeated with sufficiently severe or pervasive discriminatory intimidation, ridicule, and insult as to alter the conditions of her employment and create an abusive working environment. First of all, Lugo offers no specific dates for these incidents or defines the frequency with which they occurred. In addition, only one of the alleged comments was directed specifically at her. The rest were comments made during meetings attended by coworkers, the testimony of which she fails to offer to corroborate her own. As a result, even viewing the record in the light most favorable to Plaintiff and drawing all inferences in her favor, we find that Lugo's assertions of discriminatory remarks on the part of her supervisors do not rise to the level of a hostile work environment. Hence, her ADEA hostile work environment claim must be hereby **DISMISSED WITH PREJUDICE.**

### 4. Retaliation Claim

Plaintiff also makes a retaliation claim under the ADEA alleging that many of the adverse employment actions taken against her were in retaliation for the complaint of age discrimination she filed by means of the letter her attorney sent to Ruiz. It is uncontested that the September 21, 2007 communication from Lugo's attorney was the only complaint filed by Lugo during her employment at Avon. The Defendant now seeks to dismiss the ADEA retaliation claim arguing that a lack of causation exists between Plaintiff's alleged protected activity — sending a complaint letter to her employer through an attorney - and her termination because it took place over a year afterwards. See Docket No. 38. However, in her opposition, Lugo asserts that, Avon took additional acts of retaliation against her between her complaint of discrimination and her termination, such as: (1) not following up on Lugo's discrimination complaint as required by Avon's written policy of discrimination; (2) trying to discredit Lugo's performance by putting her in a probationary period without documenting the same as required by Avon's probationary period policy; (3) improperly assessing Lugo's 2007 performance evaluation as the worst performance in her 16 years of employment with Avon; (4) failing to properly document her performance evaluation; (5) failing to follow Avon's Performance Management Plan procedure in order to ensure the proper documentation of the PMP; (5) failure to properly document Lugo's

alleged failure to perform on 2008; (6) failing to properly document Lugo's approval of the probationary period; and, (7) failing to properly document Lugo's achievements after her probationary period ended. See Docket No. 48.

"In addition to prohibiting age discrimination, the ADEA also protects individuals who invoke the statute's protections." Ramirez Rodriguez v. Boehringer Ingelheim Pharmaceuticals, Inc., 425 F.3d 67, 84 (1st Cir.2005) (citing 29 U.S.C. § 623(d)) ("It shall be unlawful for an employer to discriminate against any of his employees ... because such individual ... has opposed any practice made unlawful by this section, or ... made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation under this chapter.") Where there is no direct evidence of retaliation, the plaintiff may proceed to establish a prima facie case that closely tracks the McDonnell Douglas framework: the plaintiff must show that (1) she engaged in ADEA-protected conduct, (2) she was thereafter subjected to an adverse employment action, and (3) a causal connection existed between the protected conduct and adverse action. Id.; see also Bennett v. Saint-Gobain Corp., 507 F.3d 23, 32 (1st Cir.2007) (noting that at a bare minimum, this requires an employee to make a "colorable showing of a causal connection" between his protected activity and the adverse employment action).

Defendant's assertion is correct: the temporal gap between Lugo's letter and her termination is "sufficiently large so that, without some corroborative evidence, it will not support an inferred notion of a causal connection between the two." See Bennett, 507 F.3d at 32 (citing Bishop v. Bell Atl. Corp., 299 F.3d 53, 60 (1st Cir.2002) (finding one-year gap between protected activity and adverse employment action insufficient to support a reasonable inference of causation); Mesnick, 950 F.2d at 828 (holding that a time lapse of nine months between the filing of a formal grievance and the adverse employment action undercut any inference of causation)). Notwithstanding, as asserted previously in this order, "an adverse employment action need not rise to a level of a discharge to be actionable." Coatings Inc., 251 F.Supp.2d at 1068. Adverse employment actions also include unwarranted negative job evaluations and toleration of harassment by other employees, see White v. New Hampshire Dept. of Corrections, 221 F.3d at 262, and Lugo claims to have been the victim of this other type of adverse employment actions as well. In fact, some of the complained of conduct allegedly took place shortly after Lugo's attorney sent her complaint letter until her termination. However, the

Defendant failed to address these in its motion for summary judgment.[2] Because these other adverse employment actions, which were allegedly taken as a result of her complaint of discrimination, are still in controversy at this stage of the proceedings, the undersigned has no other choice but to **DENY** the motion for summary judgment as it pertains to Lugo's ADEA retaliation claim.

**B. Supplemental State Law Claims**

The remainder of Plaintiff's claims are grounded on Puerto Rico law. Because this Court has not dismissed Plaintiff's federal law claims, her state law claims also remain pending before this Court.

## IV. CONCLUSION

For the reasons stated above, this Court hereby **GRANTS IN PART AND DENIES IN PART** Defendant's motion for summary judgment (Dockets No. 37-38). Accordingly, Plaintiff's ADEA claim pertaining to her transfer and her hostile work environment claim are hereby **DISMISSED WITH PREJUDICE.** Remaining before the Court are Lugo's ADEA termination and retaliation claims, as well as the supplemental state law claims.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, March 1, 2011.


                                    S/ JUAN M. PEREZ-GIMENEZ
                                    JUAN M. PEREZ-GIMENEZ
                                    U.S. DISTRICT JUDGE

---

[2]For example, Defendant set forth in its Statement of Uncontested Facts, that "[i]n her evaluation for the year 2007, **discussed in 2008**, Lugo received a rating of 5, which was at that time the lowest possible rating." See *Defendant's Statement of Facts*, Docket No. 37-1 at ¶ 27 (emphasis ours). This proposed fact is still in controversy because Defendant failed to properly authenticate the exhibit attached to this statement. Nevertheless, considering the statement as true for the sake of argument, the temporal proximity between Lugo's complaint of discrimination and the negative evaluation of Lugo's 2007 performance could very well satisfy the causal connection requirement to establish a prima facie case of retaliation. The Defendant, however, conveniently focused on the lack of temporal proximity between the complaint letter and the termination in its motion for summary judgment.